**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MICHAEL GRECCO PRODUCTIONS, INC. and MICHAEL GRECCO, | No. |
| *Plaintiffs*, | |
| v. | **COMPLAINT AND JURY DEMAND** |
| GUARDIAN NEWS AND MEDIA LLC and GETTY IMAGES, INC., | |
| *Defendants*. | |

Plaintiffs Michael Grecco Productions, Inc. ("MGP") and Michael Grecco ("Grecco") (together, "Plaintiffs"), by and through undersigned counsel, as and for their Complaint against Defendants Guardian News and Media LLC (the "Guardian") and Getty Images, Inc. ("Getty") (together, "Defendants"), allege as follows:

## NATURE OF THE ACTION

1.      This is an action for copyright infringement brought against Defendants for their unauthorized and infringing uses of Plaintiff's photograph (the "Photograph"), described below.

2.      Plaintiff seeks compensatory and/or statutory damages, as well as injunctive relief and attorneys' fees and related costs arising from Defendants' unauthorized and infringing uses of the Photograph.

## PARTIES, JURISDICTION AND VENUE

3.      Grecco is a resident of the State of California.

4.      Grecco is a professional photographer who makes his living by creating and licensing photographs.

5.      MGP (formerly named Michael Grecco Photography Inc.) is a corporation organized under the laws of the State of California, with a principal place of business at 3103 17th Street, Santa Monica, CA 90405. Grecco owns MGP and uses it to administer his copyrights.

6.      On information and belief, the Guardian is a limited liability company organized under the laws of New York State. It maintains a principal place of business at 315 West 36th Street, New York, NY 10036.

7.      On information and belief, Getty is a corporation organized under the laws of the State of Delaware, with a principal place of business at 601 N. 34th Street, Seattle, WA 98103. It maintains a permanent office in New York at 75 Varick Street, New York, NY 10013.

8.      This Court has personal jurisdiction over both defendants pursuant to N.Y.C.P.L.R. 301.

9.      This Court has personal jurisdiction over both defendants pursuant to N.Y.C.P.L.R 302(a) because they conducts substantial business in the State of New York; infringed Grecco's copyrights in the State of New York as described herein, purposefully targeted activities to and systematically transacted, conducted, and solicited business in the State of New York.

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the copyright laws of the United States. 17 U.S.C. §§ 101, *et seq.*

11.     Venue is proper in this District under 28 U.S.C. § 1391(b) since the alleged misconduct by Defendants giving rise to the claims asserted herein occurred in this District and/or involved parties located in this District.

12.    Venue is also proper in this District under 28 U.S.C. § 1400(a) since the alleged misconduct by Defendants occurred in this District and/or because Defendants may be found in this District.

## FACTUAL ALLEGATIONS

13.    Grecco is the sole author and, though MGP, the registered copyright owner of an October 2002 photograph of Sergey Brin and Larry Page, the founders of Google, in a makeshift office (the "Photograph"), taken well before the company reached the stratospheric levels of success it has enjoyed in recent years.

14.    The Photograph was registered with the United States Copyright Office as of November 18, 2002 as a work of visual art, No. VAu 590-445. It is reproduced below:



15.     In an article dated September 24, 2018 titled *Google at 20: how two 'obnoxious' students changed the internet* (the "Article"), the Guardian reproduced the Photograph in its entirety without alteration.[1]

16.     Beneath the Photograph was a caption crediting "Michael Grecco/Getty Images." The credit to Grecco is accurate, but the Plaintiffs have at no time authorized a license to the Photograph by Getty Images (or anyone else) to the Guardian.

17.     The reproduction of the Photograph in the Article is therefore a blatant infringement of the Plaintiffs' copyright interests therein.

## CLAIM FOR RELIEF

### COPYRIGHT INFRINGEMENT AGAINST BOTH DEFENDANTS

18.     Plaintiffs repeats and re-alleges each allegation set forth in all paragraphs above as if set forth fully herein.

19.     Grecco created and is the owner of all copyrights in and to the Photograph.

20.     Through MGP, Grecco registered his copyrights in the Photograph with the U.S. Copyright Office.

21.     Pursuant to 17 U.S.C. § 106, the owner of the copyright in a work of visual art has the exclusive right to, among other things, reproduce the work, prepare and distribute copies of the work, and display the work publicly. The actions of Getty Images and the Guardian, as described in this Complaint, constitute infringement of Grecco's copyright.

22.     Moreover, on information and belief, both Defendants knew (a) that Grecco owned the copyright in the Photograph and (b) that he had not licensed its use in the Article.

---

[1] A print copy of the article is Exhibit A to this Complaint. It can also be found online at https://www.theguardian.com/technology/2018/sep/24/google-at-20-larry-page-sergey-brin-internet

Accordingly, both Defendants committed willful infringement as defined by, *inter* alia, 17 U.S.C. 504(c).

WHEREFORE, Plaintiffs respectfully demand judgment for the following relief:

1.      Pursuant to 17 U.S.C. § 502, a preliminary and permanent injunction against Defendants precluding Defendants from displaying, advertising, promoting, and/or selling the Article (and any other materials using the Photograph) in any form and requiring Defendants to deliver to the Court for destruction or other appropriate disposition all relevant materials, including digital files of the photograph and all copies of the infringing materials described in this complaint, that are in the control or possession or custody of Defendants;

2.      Pursuant to 17 U.S.C. § 504, all allowable damages under the Copyright Act, including but not limited to, statutory or actual damages, including damages incurred as a result of Grecco's loss of licensing revenue and Defendants' profits attributable to infringement;

3.      Pursuant to 17 U.S.C. § 505, Plaintiffs' full costs, including litigation expenses, interest, and any other amounts authorized under law, and attorneys' fees incurred in pursuing and litigating this matter;

4.      Any other relief authorized by law, including punitive and/or exemplary damages; and

5.      For such other and further relief as the Court deems just and proper.

## **JURY TRIAL DEMANDED**

Plaintiffs demand a jury trial on all matters properly tried before a jury.

Dated: New York, New York
        June 18, 2019

STROPHEUS LLC

s / Stuart Weichsel

_____ s/ Ronald Adelman _____

Stuart Weichsel
Ronald Adelman

830 Third Avenue, 28th Floor
New York, New York 10022
T: (917) 688-2304
Stuart.Weichsel@Stropheus.com
Ronald.Adelman@Stropheus.com

*Attorneys for Plaintiffs*

**News** | **Opinion** | **Sport** | **Culture** | **Lifestyle**





# Google at 20: how two 'obnoxious' students changed the internet

It is two decades since Larry Page and Sergey Brin moved their fedgling startup out of their dorms. With threats to its power growing, how long can the company dominate?

by [Samuel Gibbs](#) and [Alex Hern](#)

Mon 24 Sep 2018
07.00 BST

○ ○ ○                                                                                    **395**

In  the summer of 1995, a second-year grad student called Sergey Brin was giving a tour of Stanford University to prospective students. Larry Page, an engineering graduate from the University of Michigan, was one of those being shown around the Palo Alto, California campus.

"I thought he was pretty obnoxious," Larry Page [said of the encounter.](#) "He had

really strong opinions about things, and I guess I did, too."

"We both found each other obnoxious," said Sergey Brin. "But we say it a little bit jokingly. Obviously we spent a lot of time talking to each other, so there was something there

The technology of the web at the time meant that you could tell where a webpage links to just by reading its code; but the only way to fnd out where it is linked from is to see it linked to from another page. In other words, to get an exhaustive list of every page that links to, say, stanford.edu, you need to check every other website on the internet.

Page's "Backrub" project aimed to qualify these backlinks, a complex task that not only demanded huge computing resources, but also required extremely complex mathematics, which is where the maths prodigy Brin came in.



A team-photo of members of the growing Google team in Palo Alto, California, before the move to Mountain View. Photograph: Google Llc Handout/EPA

In 1996 they began experimenting with the Stanford homepage and soon came up with the PageRank algorithm – a ranking system which would prove to be Page and Brin's breakthrough idea.

The algorithm was devised to give more weight to

links that came from more authoritative pages –
the more backlinks a site had, the more likely it
was to be a good source, similar to an academic
paper. That allowed Page and Brin to rank search
results not only by keyword frequency but by
authority. And because the system analysed links,
the more the web grew the better Backrub got.

In August 1996, Backrub became Google, a play on the term googol, meaning the
large number 10 to the power of 100. The frst version appeared on the Stanford
site, run from cobbled-together bits of computers scavenged by Page and Brin. The
system demanded so much bandwidth it would regularly take down the whole of
Stanford's internet connection, but it succeeded in letting users search all 24m
pages it had stored in its database.

On 15 September 1997 Google.com was registered and by August 1998 the frst
Google Doodle appeared – a Burning Man fgure that was intended to let everyone
know that both Page and Brin were at the festival in the Nevada  desert.

Google also got its frst funding in the form of a cheque for $100,000 written by
Andy Bechtolsheim, co-founder of Sun Microsystems, in August 1998 to "Google
Inc". The trouble was that Google Inc didn't exist yet, so after a rush to get the
paperwork lined up Google was incorporated on 4 September 1998 so the pair
could bank the cheque. Later that month the duo moved out of their dorm rooms
and into the garage of friend Susan Wojcicki (now CEO of YouTube) in Menlo
Park, California, complete with ping-pong table and bright blue carpet, receiving
further investment from Amazon founder Jef Bezos, among  others.

Early in 1999, Page and Brin attempted to sell
Google to Excite, then number two search engine
behind Yahoo, for $1m, but even after the pair had
been talked down to $750,000 by Excite venture
capitalist Vinod Khosla, Excite CEO George Bell
rejected them - although why he did remained a
matter of debate for years. Page and Brin had also
reportedly attempted to sell their technology to
then search engine Altavista and Yahoo in 1998 to
no avail.

 With
no
buyer in sight, Google started hiring



Google co-founders Sergey Brin, left, and Larry Page posing in a messy ofce setting on October 2002 in Mountain View, California. Photograph: Michael Grecco/Getty Images

engineers and moved out of the garage to an ofce in Palo Alto in March 1999. In 2001, seeking so-called "adult supervision" for the company, Eric Schmidt was hired frst as chairman and then CEO, taking over from Page. Schmidt was hired over some 50 other candidates because he had been to Burning Man, but he was tasked with the traditional corporate side of the business, leaving Page and Brin to continue to develop Google's products and technologies respectively.

**B**y the end of its frst decade, Google had efectively won the search-engine wars. PageRank had provided it its frst major leg-up, letting it ofer a better search experience than any of its competitors. To this day, the Google homepage remains clean and sparse, ofering nothing more than a logo, search feld, and two buttons.

But the pivot that saw Google go from dominating a service to dominating an industry occurred when the company realised it needed to go outside its areas of expertise, and began an acquisition spree that would seed its evolution to the global behemoth it is today.

Arguably, its most important purchase was YouTube, bought for $1.65bn in stock, then the largest purchase the company had made. Unlike many of Google's previous acquisitions, where the company bought in technology it couldn't make itself and threw its corporate weight behind making the resulting product success, YouTube was already a phenomenon, and Google had spent its own resources building a direct competitor, Google Video.

But YouTube's lead was already becoming difcult to compete with. Google was able to build a Flash-based video player in-house, but without the huge array of

videos that were already on YouTube, it had no viewers, and with no viewers, there was no reason for anyone else to upload video – a vicious cycle. So Google made a still rare move, and bought, not technology, but users.

The purchase price was eye-watering for the time, with the New York Times reporting that it sounded "like a tale from the dotcom bubble", but the story also contained a more telling quote from Steve Ballmer – then Microsoft's chief executive. "If you believe it's the future of television, it's clearly worth $1.6bn," Ballmer said.

The bet paid of. YouTube's ad revenue alone was projected to be $4bn this year.

What will be the next YouTube in Google's portfolio? The company seems to think it will come from the world of AI. In 2014, Google bought AI company DeepMind for a reported $500m, augmenting its own AI eforts which had been bundled together into the Google Brain unit. DeepMind has continued to operate largely independently as a research-focused institute, most famous for its AlphaGo AI, which became the frst machine to beat a professional player of the ancient Asian boardgame Go in 2016.



Page and Brin in 2004. Photograph: Ben Margot/AP

egulation, censorship and competition all threaten Google's crown.

R The company's frst brush with governmental pressure came when the Chinese government's internet flters started intermittently blocking Google.com in the year 2000. In 2006 the company decided <u>to ofcially launch Google.cn</u>, a decision which drew widespread <u>criticism</u>, since with a Chinese website came Chinese web censorship – something that Brin, who was born in the Soviet Union, was vocally uneasy with acceding to. Nonetheless, the censorship <u>lasted until 2010</u>, when Gmail became the target of a cyber-attack that the frm believed was attempting to gather information on Chinese human rights activists.

It was recently revealed that the company is running a project, Dragonfy, aimed at producing a newly censored version of its search and news products, ready for a re-entry to China.

But it's not just repressive regimes that have forced Google to toe the line. In Europe and the US, the company has also had to give ground to legislatures, regulators and the judiciary.

One of the company's frst areas of confict was over copyright. Less than three months after Google bought YouTube, it was <u>hit with a lawsuit</u> from US media conglomerate Viacom for copyright infringement, a battle that would rage for seven years. Viacom had a strong case, noting that more than 150,000 clips of its copyrighted shows were available on the video-sharing site.

But Viacom's argument was slightly undercut by the revelation that it had uploaded much of the material itself. "For years, Viacom continuously and secretly uploaded its content to YouTube, even while publicly complaining about its presence there," <u>YouTube's chief counsel wrote in 2010</u>. The case was finally <u>settled in March 2014</u>. No money changed hands.

Another copyright confict had potentially larger ramifcations. Agence France-Press sued Google in March 2005 for $17.5m for allegedly using its photos and stories on Google News without permission, leading to an arrangement to host various news agency content starting in 2007. That suit was followed by one from the Belgian newspaper group Copiepresse, and complaints from the French and German journalism bodies as well.

The rows over Google News have continued, in some form or another, for the past decade, and Google has been forced into many concessions: paying licensing fees in some countries, settling out of court in others, and <u>creating charitable funds to</u>

support journalism elsewhere.



A computer display shows knockof websites of both Google and YouTube in China, 2010.
Photograph: Ng Han Guan/AP

But while it lost some battles, it won the war, for the simple fact that Google News became too big for publishers to ignore. When, in Germany, Google ofered the ability for publishers to remove their content from the search engine, Axel Springer, one of the country's largest publishing companies, took the chance. It told Google the company would have to pay or cease to run images and snippets of text from Axel publications. Google chose the latter option, and, Axel said, trafc plunged. It bowed out of the fght after just two weeks.

The size of Google is undoubtedly a strength in fghts like that, but it opens another avenue of attack for regulators: it is, in some areas, a monopoly. That means it has to be very careful about how it wields its power, or it will fall prey to competition regulators. In Europe, that process has already begun, with the commission fnding that Google had abused its monopolies in search engines and mobile phone app stores. The company has been fned €6.7bn for those two breaches.

Regulations aren't the only threat on the horizon for Google, though. Amazon is going after Google's crown jewels: search advertising. Almost 90% of Google's revenue in the last three months came from advertising, and Amazon could seriously threaten its dominance of online retail if this continues.

Facebook has a more fundamental line of attack: it wants to kill the web. A Facebook future is one in which a significant proportion of humanity's data sits, not on the open web, but on the closed social network. That would cut Google of from the information it can search, index and make available, forcing it into ever more extractive relationships with its own users as data sources  instead.

Of course, the threats could come from a company which doesn't even exist yet. Maybe one that's being founded today, and in 20 years time will be ready to take on Google, just like Google has taken on the legacy stars of its own industry.

Topics
Alphabet / features

## promoted links from around the web          Recommended by Outbrain

**Mos People Don't Know About This Free Amazon Upgrade**
HONEY

**One Thing All Cheaters Have In Common, Brace Yourself**
WWW.PEOPLEWHIZ.COM

**[Pics] He Actually Married One Of His Bigges Fans**
POPULAR EVERYTHING

**14 Incredible Stories From the Set of 'Deliverance'**
RANKER

**[Pics] Hidden Facts Mos People Don't Know About The Amish**
ICE POP

**[Gallery] Each State Hilariously Depicted By One Stereotypical**
TOOCOOL2BETRUE

**Photos Of The Monaco Royal Family: Weddings & More**
MONEY POP

**Want to Stop Your Macular Degeneration? Read This Firs**
AARP



# Most popular



UK   World   Business Football   UK                    Environment Education Society Science   **Tech**

**News** | **Opinion** | **Sport** | **Culture** | **Lifestyle**

**Sign up to our daily email**

address

About us

Contact us

Complaints & corrections

SecureDrop

Work for us

Privacy policy

Cookie policy

Terms & conditions

Help

All topics

All writers

Modern Slavery Act

Digital newspaper archive

Facebook

Twitter

Advertise with us

Guardian Labs

Search jobs

Dating

Patrons

Discount Codes

**Support The Guardian**

Available for everyone, funded by readers

**Contribute**

**Subscribe**

**Back to top**

© 2019 Guardian News & Media Limited or its afliated companies. All rights reserved.